Shawna Parks (CA BAR NO. 208301)
Amelia Evard (CA BAR NO. 341940)
Disability Rights Advocates
455 Market St. Ste 1940
PMB 509115
San Francisco, CA, 94105-2448
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
Emails: sparks@dralegal.org
aevard@dralegal.org

Megan Stanton-Trehan (CA BAR NO. 293253)
DISABILITY RIGHTS CALIFORNIA
888 W. 6th Street, Suite 700
Los Angeles, CA 90017
Telephone: (213) 213-8000
Facsimile: (213) 213-8001
Email: Megan.Stanton-Trehan@disabilityrightsca.org

Charlotte Lanvers (CA BAR NO. 257814)
DISABILITY RIGHTS CALIFORNIA
3075 Adeline St. #205
Berkeley, CA 94703-2578
Telephone: (510)267-1213
Charlotte.Lanvers@disabilityrightsca.org

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| DISABILITY RIGHTS CALIFORNIA, the California Protection and Advocacy Agency for Persons with Disabilities,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF KINGS and its PROBATION DEPARTMENT, and the KINGS COUNTY OFFICE OF EDUCATION,<br><br>Defendants. | Case No.<br><br>**Complaint for Declaratory and Injunctive Relief** |

## JURISDICTION

1. This action seeks relief against Defendants County of Kings, its Probation Department, and the Kings County Office of Education (collectively, "Defendants") for violations of the United States Constitution, Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12131 et seq., Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, Article IX, sections 1 and 5 of the California Constitution, and California state law.

2. This Court has jurisdiction over Plaintiff's federal claims arising under the United States Constitution, 42 U.S.C. § 1983, Title II, and Section 504, pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Through the same acts and omissions, Defendants have also violated Plaintiff's rights under state law. This Court has supplemental jurisdiction over those claims under 28 U.S.C. § 1367 because they arise from the same case or controversy under Article III.

4. This Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. § 2201 and Federal Rules of Civil Procedure 57 and 65, and authority to award reasonable attorneys' fees and costs under 42 U.S.C. § 12205 (ADA), 29 U.S.C. § 794a(b) (Section 504), 42 U.S.C. § 1988, and California Code of Civil Procedure section 1021.5.

5. Plaintiff Disability Rights California ("DRC") is California's designated Protection and Advocacy ("P&A") System and brings claims on its own behalf under the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.*, the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15041 *et seq.*, and the Protection and Advocacy for Individual Rights Act, 29 U.S.C. § 794e (together, the "P&A Acts").

6. Plaintiff DRC raises claims on behalf of itself and its Constituents for violations of the Constitution, Title II, Section 504 of the Rehabilitation Act, and state law arising from Defendants' treatment of youth with disabilities in their custody or

supervision.

## PRELIMINARY STATEMENT

7. DRC brings this action against Kings County, its Probation Department, and the Kings County Office of Education ("Defendants") for their treatment of youth with mental health disabilities, intellectual disabilities, and learning disabilities who are detained by, supervised by, or entitled to an education from those agencies.

8. Defendants operate the Kings County Juvenile Center ("Juvenile Center") and J.C. Montgomery School, where all detained youth are held and educated. Average daily population was 22 in the second quarter of 2025 against a capacity of 56; as of May, 2026, it was 21. DRC's investigation found youth disciplined for minor infractions through prolonged isolation in hallways and subjected to excessive physical and chemical force, including pepper spray directed at youths' faces and eyes, followed by inadequate decontamination treatment after such use of chemical force. As a result, DRC's Constituents, youth with mental health and behavioral disabilities, suffer physical harm, escalating discipline, new charges, extended confinement and denial of their educational rights.

9. The County's youth arrest and detention rates are among the highest per capita in the state. The County lacks diversion programs, leading to arrests for minor offenses and unnecessary probation supervision, and it detains low risk youth, including for technical violations of their probation such as poor grades or truancy. The result is an excessive recidivism rate and the criminalization of disability-related behavior that could be addressed through school and community-based supports.

10. Defendant Kings County Office of Education ("KCOE") operates J.C. Montgomery School within the Juvenile Center. Its suspension rate has historically exceeded seven times the state average. KCOE, with the assistance of probation staff, has frequently removed students from class without due process or compensatory educational services, and has failed to identify or adequately assess students' disabilities.

11. DRC seeks: (1) a declaratory judgment that Defendants have violated federal

law; and (2) preliminary and permanent injunctions requiring Defendants to reduce the excessive use of force, improve conditions of confinement, ensure access to education, reduce excessive detention and recidivism, and reform probation supervision to prioritize rehabilitation over technical compliance.

## VENUE

12. Venue is proper under 28 U.S.C. § 1391(b) as a substantial portion of the events or omissions giving rise to this action occurred in this district, and Defendants reside here.

## PARTIES

### *Plaintiff DRC and its Constituents*

13. DRC is a non-profit agency designated by the Governor of California as the state's Protection and Advocacy System for persons with disabilities. Cal. Welf. & Inst. Code §§ 4900(i); 4901. Its mission is to work "in partnership with disabled people to defend rights, advance opportunities, grow power, and expand public support for disability justice in California and beyond."

14. DRC's work is guided by its Board of Directors, the majority of whom have disabilities, and by the PAIMI Advisory Council. DRC also gathers input through surveys, focus groups, and public hearings from people with disabilities and their communities to set its goals.

15. The P&A Acts authorize P&A systems, including DRC, to investigate abuse and neglect of people with disabilities and to protect their rights "through activities to ensure the enforcement of the Constitution and Federal and State statutes." 42 U.S.C. § 10801(b); *see also* 42 U.S.C. § 15041; 29 U.S.C. § 794e(a).

16. DRC is authorized to "pursue administrative, legal, and other appropriate remedies" to ensure the protection of the rights of people with disabilities. 42 U.S.C. § 10805(a)(1)(B); 42 U.S.C. § 15043(a)(2)(A)(i); 29 U.S.C. § 794e(f)(3); Cal. Welf. & Inst. Code § 4902(b)(2); *see also Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003). DRC brings this action on behalf of youth with disabilities who are now or

will be detained at the Juvenile Center, referred collectively as the "DRC Constituents." *See Hunt v. Washington State Appl. Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Mink*, 322 F.3d at 1111-12.

17. DRC shares an interest with its Constituents in resolving the issues alleged here. It has diverted significant organizational resources to investigate Defendants' violations and advocate for remedies, long after Defendants had the opportunity to resolve these allegations without litigation, impairing DRC's ability to advance its mission. *See Havens Realty Corporation v. Coleman*, 455 U.S. 363, 372-80 (1982).

18. DRC has standing to vindicate its Constituents' rights under the Constitution, Title II, Section 504, and state law, including the right to be free from unnecessary detention and excessive force, and to access education and needed services in their homes and communities. DRC Constituents have representation and influence in DRC's operations, and their individual participation in this lawsuit is not required. The requested declaratory and injunctive relief sought is germane to DRC's mission and activities.

### *Youth Exemplars*

19. DRC Constituents include the following youth with disabilities, each of whom would have standing to sue individually. Pseudonyms are used to protect their privacy and guard against retaliation.

### *Youth 1*

20. Youth 1 is 17 and currently detained at the Juvenile Center. He has behavior-related disabilities and was previously eligible for an Individualized Education Program ("IEP"). He has cycled in and out of custody since age 11 and was most recently detained in Spring 2023.

21. Staff subject Youth 1 to excessive and punitive discipline for disability-related behaviors, issuing court reports for minor conduct like horseplay or delayed compliance. Punishments include room confinement, hallway status/reassigned seating, losses of incentive points and days toward early release, and loss of his snack during

weekly family visits.

22. Youth 1 has been prone-restrained while handcuffed after being pepper sprayed. When multiple youth are sprayed at once, he has been given only a few minutes to decontaminate.

23. Youth 1 has also gone hungry and has been disciplined for sharing or saving food, losing incentive days for saving hard-boiled eggs from breakfast. Rather than provide adequate food, staff confiscate it as "contraband" and punish him.

24. Youth 1 reported that while he was attending J.C. Montgomery School, he did not receive his disability-related accommodations consistently in the classroom, and he was not assessed in all areas of suspected or known disability to determine whether he required additional accommodations or services.

***Youth 2***

25. Youth 2 is 18 and was recently detained at the Juvenile Center. On information and belief, he remains on probation and can be re-detained at any time. He has intellectual, mental health, and learning disabilities and is IEP-eligible.

26. Officers have imposed excessive discipline on Youth 2 for disability-related behaviors. He was housed alone in the "Birch Unit" due to concerns of him jumping from a top bunk.

27. Youth 2 has been pepper sprayed while being attacked by other youth. After one severe spray to the eyes, he was showered while experiencing impaired vision and severe emotional distress.

28. Youth 2 was frequently removed from the classroom due to disability-related needs, which were not documented as suspensions. This caused him to miss instructional minutes and special education services.

***Youth 3***

29. Youth 3 is 18 and currently detained at the Juvenile Center. He had an IEP for mental health and learning disabilities. Officers have pepper sprayed him in multiple facility locations, including in the classroom in July 2025.

30. Youth 3 did not receive career technical education or individualized mental health support through his IEP, despite indicating that he needed these services.

31. Youth 3 reports that the grievance process is ineffective, with few responses and no meaningful resolution.

***DEFENDANTS***

32. Defendant County of Kings, through its Probation Department ("County"), manages and controls the Kings County Juvenile Center ("Juvenile Center"). Cal. Welf. & Inst. Code § 852. The Juvenile Center is located in Hanford, California, holds between 20 and 30 youth on average, and includes Kings County Secure Youth Treatment Facility ("SYTF"), which, on information and belief, houses up to ten eligible youth.

33. Defendant Kings County Office of Education ("KCOE") is a California county office of education. Under state law, county offices of education operate juvenile court schools, which includes educating detained students with disabilities. Cal. Educ. Code §§ 48625.2, 56150.

34. KCOE operates and provides education services to all detained youth at the Juvenile Center who have not yet graduated from high school.

35. The County oversees its Probation Department and is also responsible for the County Department of Behavioral Health.

36. Defendants are jointly responsible for all policies, practices, and procedures at the Juvenile Center, and for compliance with California Board of Corrections' minimum standards. *See* Cal. Code Regs., tit. 15, § 1310.

**LEGAL RIGHTS OF JUSTICE-INVOLVED YOUTH**

37. Youth with disabilities detained in juvenile detention have important protections under federal and state law:

38. The Due Process Clause of the Fourteenth Amendment protects youth confined at the Juvenile Center, whether detained pending adjudication or committed following disposition, including youth committed to the SYTF. Because juvenile proceedings are not criminal and juvenile confinement may not be punitive, these youth

are entitled to conditions at least as protective as those afforded adult pretrial detainees and persons involuntarily committed. Title II prohibits disability-based discrimination by public entities, including the County. 42 U.S.C. § 12132. Section 504 prohibits disability discrimination in federally funded programs, including the County Probation Department and KCOE. 29 U.S.C. § 794; 28 C.F.R. § 42.503(a)-(b). The Supreme Court has held that Title II requires services to be provided in the most integrated setting appropriate. *See Olmstead v. L.C.*, 527 U.S. 581 (1999).

39. Section 504, 29 U.S.C. §794, bars excluding a qualified individual with a disability from a federally funded program "solely by reason of" disability. Its regulations require a local educational agency to provide a "free appropriate public education" (FAPE) for each qualified student with a disability, regardless of the nature or severity of the disability. 34 C.F.R. § 104.33.

40. Section 504 imposes an affirmative obligation to identify students suspected of having disabilities. Specifically, local educational agencies must seek out, evaluate, and identify children with disabilities. 34 C.F.R. § 104.32(a)-(b); *Id.* at §104.35(a).

41. The California Constitution guarantees all youth, including incarcerated youth, the fundamental right to an education. Cal. Const. art. IX, §§ 1, 5; *see also Serrano v. Priest*, 5 Cal.3d 584 (1971) (*Serrano I*); *Serrano v. Priest*, 18 Cal.3d 728 (1976) (*Serrano II*); *Butt v. State of California*, 4 Cal.4th 668 (1992).

42. Incarcerated students are entitled to "a quality educational program" responsive to different learning styles and abilities, including those of students with disabilities. Cal Code Regs., tit. 15, § 1370(b), (d).

43. Incarcerated students must receive a minimum of 240 minutes of instruction daily, in a course of study complying with the California Education Code and constitutional obligations.

44. School disciplinary policies may not deprive students of their education. Cal. Code Regs., tit. 15, § 1390.

45. Probation departments and county offices of education are jointly

responsible for ensuring incarcerated youth receive mandated education services and must develop written procedures coordinating educators and probation staff. *See* Cal. Code Regs., tit. 15, § 1370(a)

46. California Government Code section 11135 similarly prohibits disability discrimination in state programs.

47. Juvenile detention facilities are required to promote rehabilitation in a "safe and supportive homelike environment" for the youth in its custody. *See* Cal. Welf. & Inst. Code § 851. A juvenile detention facility "shall not be deemed to be, nor be treated as, a penal institution." *Id.*

48. State law restricts isolation ("room confinement") and prohibits its use "for purposes of punishment, coercion, convenience, or retaliation," or to the extent it compromises a youth's mental or physical health. Cal. Welf. & Inst. Code § 208.3.

49. State licensing regulations, enforced by the Board of State and Community Corrections ("BSCC"), grant detained youth additional protections. Cal. Code Regs., tit. 15, § 1300 et seq.

50. Facilities must have written policies ensuring appropriate counseling and casework services for all youth. Cal. Code Regs., tit. 15, § 1356.

51. Chemical agents, including pepper spray, may never be used "as punishment, discipline, retaliation or treatment," and exposed youth must not be left unattended until fully decontaminated. Cal. Code Regs., tit. 15, § 1357.

52. Physical restraints may not be used "as punishment or discipline, or as a substitute for treatment." Cal. Code Regs., tit. 15, § 1358.

53. Facilities must implement written policies and procedures whereby any youth may appeal and have resolved grievances relating to any condition of confinement. Cal. Code Regs., tit. 15, § 1361.

54. Facilities must provide programs, recreation, and exercise to minimize time youth spend confined to their rooms. Cal. Code Regs., tit. 15, § 1371.

## FACTUAL ALLEGATIONS – DRC'S INVESTIGATION

55. DRC and its counsel, Disability Rights Advocates ("DRA"), have conducted a multi-year investigation into conditions at the Juvenile Center, launched after DRC received complaints about the facility's conditions and conducted monitoring inspections under its authority as a state P&A system.

56. DRC's investigation began in early 2019. It first visited the Juvenile Center on February 28, 2019, touring the facility, and meeting with youth and staff, including then Chief of Probation, Bakker.

57. Based on that visit and subsequent Public Records Act requests DRC notified the County on August 9, 2019, that it had found probable cause of abuse and neglect of youth with disabilities in violation of federal and state law.

58. DRC then engaged two nationally recognized experts: The Center on Juvenile and Criminal Justice ("CJCJ"), a nonprofit nonpartisan entity that conducts data-driven research and policy on effective approaches to criminal and juvenile justice policies; and Dr. Peter Leone, a national expert on education in secure juvenile facilities.

59. Plaintiff DRC returned for further inspection on August 22, 2019, interviewing youth and staff, including Chief Bakker, Chief Probation Officer Kelly Zuniga, Juvenile Corrections Manager Carla Corbett, Deputy Chief Luttrell, and medical staff.

60. DRC continued requesting and reviewing records, though the Coronavirus pandemic significantly impeded its investigation through 2020 and much of 2021.

61. DRC, DRA, and CJCJ conducted another inspection on November 10, 2021, again interviewing youth and staff.

62. On September 21, 2022, DRC sent Defendants an eleven-page letter detailing violations of federal and state disability and constitutional law. The County did not initially respond.

63. DRC conducted another inspection on November 14-15, 2022, again interviewing youth and staff, and observing classroom instruction and programming.

64. After DRC requested a response to the September 21, 2022 letter, the County asked for a summary of the issues and proposed solutions. DRC provided a four-page summary letter on June 14, 2023; despite requests to negotiate, Defendants did not respond.

65. Also on June 14, 2023, DRC learned from CJCJ that BSCC had inspected the Juvenile Center and found it out of compliance with Title 15's Minimum Standards for Juvenile Detention Facilities on isolation, use of force, and lack of programming—issues DRC had raised four years earlier.

66. On September 5, 2023, DRC and DRA released a public report, *Youth in Crisis: How Kings County Locks Up Youth With Disabilities*, https://www.disabilityrightsca.org/custom-page/youth-in-crisis-how-kings-county-locks-up-youth-with-disabilities (last visited Sep. 29, 2026), detailing the County's high arrest and recidivism rates and its inadequate services and excessive force and isolation.

67. DRC and DRA conducted further inspections, including of J.C. Montgomery School, on October 2, 2023, one year later on October 4, 2024, and again on September 9-10, 2025, interviewing youth and staff and observing instruction, programming, and recreation.

68. Since October 2023, DRC has been negotiating with the Defendants to resolve the issues raised in this complaint.

## EXCESSIVE FORCE AND FAILURE TO PROTECT YOUTH FROM VIOLENCE

69. The Juvenile Center functions as a prison-like and regimented environment. Staff in tactical vests openly carry pepper spray and identify as "guards." Minor misbehavior triggers escalating sanctions, isolation, court reports, and extended detention; youth are pepper sprayed, shackled and "body-slammed" for low-level conduct. These harsh responses escalate trauma and behavior rather than reducing it. Youth with disabilities are disproportionately targeted, resulting in repeated discipline and extended confinement, while limited programming produces prolonged idleness and

a confusing incentive system that further disadvantages them.

***Use of Chemical Force***

70. Probation staff routinely use pepper spray to control detained youth.

71. Pepper spray causes intense burning in the eyes, nose, and throat, coughing, and temporary blindness, leaving an oily residue that cannot be washed off with water alone.

72. Staff carry 4-ounce ("MK-4") canisters on their vests at all times and store 16-ounce ("MK-9") canisters on every unit; in the Birch (MAX) unit, a guard keeps an MK-9 on their belt at all times. Staff present in the classroom also carry both, and have deployed pepper spray there as recently as July 2025, typically emptying the can rather than using short bursts.

73. Staff deploy spray indiscriminately to fill a space or directly on youth; facility policy specifically directs staff to spray youths' faces and eyes.

74. Staff use pepper spray after minimal provocation, including non-violent conduct such as talking back or delayed compliance, and sometimes on youth already compliant, subdued, restrained, or in mental health crisis, including during self-harm incidents.

75. BSCC warned the County in 2017 to stop using MK-9 canisters on the units; the County ignored the warning, and a 2023 BSCC report found staff failed to properly document use-of-force incidents.

76. Youth not directly targeted still suffer pain and breathing difficulty from "overspray" in shared spaces.

77. In a 2023 incident, staff sprayed uninvolved youth on the ground with an MK-9 canister and continuously sprayed youth who were cornered and attempting to comply.

78. Spray deployed during mealtimes contaminates food, and residue can linger in common areas, including in rugs.

79. Youth often wait excessively long to shower after exposure; effective

decontamination wipes were not provided until 2024. Some youth resort to rinsing with toilet water.

80. Staff routinely threaten pepper spray use, contributing to a coercive, punitive environment.

81. Most states ban pepper spray in juvenile facilities; California is one of only six that permits it in locked facilities, and neighboring counties are reducing or eliminating its use.

82. Frequent pepper spray use disproportionately affects youth with disabilities, who may be slower to respond to commands or struggle to sit still, making them more likely to be threatened, sprayed, and targeted for disability-related behavior.

83. Pepper spray also carries heightened health risks for youth with asthma, heart conditions, and trauma histories, and poses significant psychological risk—particularly to youth with PTSD or other mental-health disabilities.

***Use of Physical Force***

84. Staff routinely use excessive physical force and mechanical restraints, including handcuffs and leg irons, on youth, including those with disabilities and those in mental health crisis, sometimes “body-slamming” youth for minor violations like defiance.

85. Center administrators reported roughly two use-of-force incidents per month per ten youth. A BSCC inspection found restraints, including leg shackles and the full-body WRAP, used on youth who posed no threat, and that staff likely undercounted incidents by failing to identify restraint use as force.

86. Staff disproportionately use physical force against youth with disabilities without accounting for their disabilities, and such youth, particularly those with trauma histories, are more likely to engage in conduct precipitating force and more vulnerable to its adverse, PTSD-exacerbating effects.

***Isolation***

87. State law restricts isolation and prohibits its punitive use. Room confinement

for more than four hours at a time requires extensive documentation and approval.

88. Despite the restrictions, staff routinely isolate youth through several mechanisms in order to discipline and control them.

89. Until April 2024, staff used undocumented "reassigned seating," "hallway assignment," or "chair status" forcing youth to sit silently for hours or days, functioning as undocumented isolation. Although Probation states it eliminated the practice in response to DRC's advocacy, it could resume without court intervention. Youth were held on hallway status for days, including during school hours, losing both program time and legally required education. Some youth report it is worse than cell confinement because they can see and hear activities they are excluded from, under constant surveillance and unable to lie down. Infractions triggering it included disrespect, talking during meals, or turning their heads while walking. Staff also impose room confinement during shift changes for administrative convenience, a use of isolation that violates California law, as no legitimate need justifies it. Cal. Welf. & Inst. Code § 208.3.

90. Youth are also placed in room confinement up to 24 hours a day, taking meals and performing hygiene tasks alone in their cells.

91. A 2023 BSCC report found youth on suicide watch spent up to two days in room confinement awaiting a clinician, denied programming as standard practice, and found staff unlawfully used confinement to punish minor misbehavior.

92. A 2024 BSCC review again found the County isolating suicide-watch youth and denying them programming.

93. Prolonged isolation causes severe psychological harm to adolescents, who need social contact to develop, and can cause or worsen PTSD, depression, hypervigilance, anxiety, distrust, and suicidal ideation—risks that often persist into adulthood. It also undermines rehabilitation by limiting access to programming and breaking down the trust needed for therapeutic relationships.

94. Youth with disabilities, especially those with ADHD and behavioral-health conditions, are disproportionately subjected to hallway status and denied program time

for disability-related behavior; staff continue to treat such behavior as "acting out" rather than disability-related, even after formally eliminating hallway status.

95. These youth are more likely to engage in conduct that precipitates isolation, more vulnerable to its effects given weakened adaptive mechanisms, and more likely to reengage in the same behavior afterward, making isolation counterproductive to safety and rehabilitation.

96. Rigid isolation requirements, such as sitting silently while other youth engage in recreation, are especially difficult for youth with ADHD and similar conditions, trapping them in cycles of extended isolation and jeopardizing both their in-facility safety and their special-education access and success after release.

97. Prolonged isolation, like the excessive force, is part of the broader punitive and hostile environment pervading the Juvenile Center that is particularly harmful to youth with disabilities.

### *Arbitrary Discipline*

98. The facility's "behavior management plan" is a confusing incentive structure poorly understood by staff and youth alike.

99. Staff impose discipline arbitrarily, including for conduct like speaking out of turn, sharing food, or putting on a sweater when cold, and sometimes punish groups collectively for one youth's conduct.

100. Youth report retaliation for filing grievances.

101. Youth with disabilities experience this system differently: staff discipline them disproportionately, including for disability-related behavior such as ADHD-linked fidgeting or slow compliance, without accounting for disability.

102. This results in lost points, isolation, and other discipline, and prevents these youth from earning privileges or incentive days that would shorten their stay, compromising rehabilitation, delaying progress through commitment programs, and leaving many feeling they will never leave custody.

***Hostile Environment and Forced Idleness.***

103. Probation provides youth few meaningful activities or programming, leaving youth bored and prone to conflict. Programming is minimal, largely passive television or video content, and group sessions are led by the same staff who impose discipline, discouraging participation; a "journaling" session is inaccessible to youth with certain kinds of learning disabilities.

104. Youth frequently go hungry due to insufficient and poor-quality food and are punished for sharing, saving and hoarding food out of fear of hunger.[1]

105. Food insecurity is associated with substantially higher rates of physical altercations and anxious, aggressive, or oppositional behavior in children.

106. Conditions are punitive rather than "safe and supportive": youth sleep on thin plastic mattresses bolted to the floor, are limited to one blanket even in winter, and are barred from layering clothing for warmth, while staff wear fleece.

107. Visitation is similarly punitive: a "no contact" policy barred hugs during visits until October 2024, and the single permitted vending-machine snack is often withheld as punishment for disability-related behavior.

108. Probation does not solicit youths' input on facility conditions, unlike jurisdictions that have used youth councils and surveys to improve climate.

***Interference in the J.C. Montgomery Court School***

109. The County operates an on-site court school, J.C. Montgomery School, "in conjunction" with KCOE. Cal. Code Regs., tit. 15, § 1370(a). The County must also provide access to online college courses to youth with a diploma or equivalent. Cal. Welf. & Inst. Code § 858(b).

110. With KCOE's knowledge and permission, probation staff, not educators,

[1] "Food insecurity" is a term defined by the United States Department of Agriculture (USDA) that indicates that the availability of nutritionally adequate and safe food is limited or uncertain. U.S. Dep't of Agriculture, *What is Food Insecurity?* (Oct. 25, 2023), https://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-u-s/measurement/#insecurity.

control classroom discipline, often deny students breaks required due to disability-related needs, remove students from the class, report behavior to the court, and use pepper spray in classrooms. KCOE does not intervene to allow the youth the breaks as required by their IEPs.

111. J.C Montgomery suspension data reflects this: a 21.2% rate for 2023-2024—roughly seven times the state average of 3.2% and four times the state court school average of 6.6%, meaning nearly one in four students was suspended at least once. Most recently, during 2024-25, J.C. Montgomery School reported a significant decrease in suspensions to 4.2%. *See* California School Dashboard, *J.C. Montgomery Suspension Rate*, https://www.caschooldashboard.org/reports/16101651630102/2025/conditions-and-climate#suspension-rate (last visited Sep. 22, 2026). However, youth allege that they were often removed from class and missed school instructional time during the 2024-25 school year, suggesting potential underreporting or lack of documentation of classroom removals.

**INADEQUATE MENTAL HEALTH TREATMENT**

112. High-quality mental health care is critical to the well-being and safety of youth detained in Kings County; studies estimate up to 60% of detained youth nationally have a mental health and behavioral disability, and youth in juvenile corrections show markedly elevated PTSD rates. Many Juvenile Center youth have trauma histories and need services rather than detention.

113. The County reported no youth mental-health cases to BSCC in past periods, but this is contradicted by reports that a high proportion of youth have mental health and behavioral disabilities; roughly 80% of detained youth were taking psychotropic medications through Wellpath, a private provider contracted with the county.

114. The Center has failed to train staff to identify and appropriately respond to youth experiencing trauma and mental health or behavioral disabilities, contributing to punitive, traumatizing responses including excessive discipline, isolation, and force.

115. Youth with mental health and behavioral disabilities report being belittled

and ridiculed by staff, sometimes escalating to hostility; youth with intellectual disabilities reported being provoked and degraded, including one whose alleged offense was disclosed to other youth, endangering him. Youth also reported peer abuse that staff did not address.

116. Mental health support is insufficient even though many youth have open cases.

117. Without adequate mental health services, youth with disabilities cannot access the rehabilitative, educational, and vocational services needed to succeed after release.

118. The Center's rehabilitative programming is largely delivered through workbooks by probation staff who lack training to address youths' complex needs. Youth committed to the SYTF are housed dorm-style with a revolving pre-disposition population, increasing conflict; some express a preference for adult facilities based on a perception of more programming, despite the well-documented harms of placing youth in adult detention, including solitary confinement and a suicide risk five times higher than in juvenile facilities.

## FAILURE TO IDENTIFY STUDENTS WITH DISABILITIES

119. KCOE is not adequately locating, identifying, or evaluating students with disabilities; Constituents report needing special education help for disability-related behavior and needs, but never being evaluated at J.C. Montgomery School.

120. Evaluations by KCOE fail to assess students in all areas of suspected disability; Defendants failed to assess Youth 1 or Youth 2 in all areas of suspected or known disability, needed to determine their disability-related needs. Other Constituents reported to DRC that they were never assessed but believe that they could have benefited from special education services due to disability-related needs related to symptoms of ADHD, Anxiety, Depression, or PTSD.

## FAILURE TO PROVIDE EDUCATION AND SPECIAL EDUCATION SERVICES AND ACCOMMODATIONS

121. Defendants fail to provide required instructional minutes and disability-related supports. Based on DRC observations and Constituent interviews, classrooms are chaotic, with eight to ten youth, two to three probation staff, and up to five school staff present at once, with instruction proceeding for some students while others work on unrelated material amid constant talking.

122. As of September 2025, posted class schedules did not match what students actually worked on; most engaged with computer assignments unrelated to classroom instruction rather than the teacher's lesson.

123. Constituents' requests for breaks are sometimes denied; Youth 1 and Youth 3 report frequently not receiving disability-related accommodations, and classroom aide positions that once provided such accommodations were cut in 2025 and not refilled.

124. Constituents are removed from class for extended periods of time by probation staff, and school is sometimes cancelled for large portions of or entire days with no makeup services or compensatory work, depriving them of required instruction and of their constitutional right to an education.

## UNLAWFUL RESPONSES TO CLASSROOM BEHAVIOR, INCLUDING USE OF RESTRAINTS AND SECLUSION

125. Defendants fail to provide appropriate behavior supports or fully implement a school-wide positive behavior intervention system ("PBIS") at J.C. Montgomery School.

126. Two to three probation staff in each classroom, not KCOE staff, manage behavior and discipline. Probation staff carry and use pepper spray in the classrooms, physically restrain students, and remove them from school.

127. These removals are not consistently documented as suspensions, depriving Constituents of due process and the opportunity to seek compensatory education.

128. Constituents report witnessing peers, including Youth 2, removed from class

to their rooms for extended periods without instruction, and observed in distress.

129. Because Probation carries out these removals, they go untracked in school records, resulting in missed procedural protections such as required manifestation determination reviews. 34 C.F.R. § 104.35(a).

## EXCESSIVE RECIDIVISM AND PUNITIVE, NON-REHABILITATIVE COMMUNITY SUPERVISION

### *Failure to offer diversion and effective reentry services*

130. Probation offers no diversion programs as an alternative to arrest and detention, contributing to the criminalization of disability-related misbehavior.

131. The County's youth arrest and detention rates are among the state's highest. Kings County incarcerates roughly 12 percent of arrested youth, twice the state average of 6 percent. compared to 3 percent in comparable rural Imperial County; its overall arrest rate, 115.8 per 10,000 population, is nearly double the statewide rate of 61.9 per 10,000.

132. A status offense is a non-criminal act that is considered a violation of law only because of a youth's status as a minor. Typical status offenses include truancy, running away from home, violating curfew, underage use of alcohol, and general ungovernability.

133. Status offenses drive many arrests: Kings County youth are arrested for status offenses at four times the state rate (23.7 vs. 5.9 per 10,000 in 2020). Many Constituents first encounter Probation after arrest for a status offense, family dispute, or minor offense, often disability-related and school-based; unlike other jurisdictions, the County funds no community-based diversion alternative.

### *Punitive, non-rehabilitative community supervision*

134. Many youths are placed on probation with strict conditions under high-caseload officers who prioritize technical compliance over rehabilitation and readily recommend incarceration for minor acts—poor school performance, a missed counseling appointment—regardless of disability-related cause.

135. Attendance and grade conditions disproportionately affect youth with disabilities, who often struggle in school due to disability-related behavior and inadequate special education support.

136. Mental health treatment conditions often fail youth who lack information on establishing care, rapport with an assigned therapist, in-person options, or accepted insurance; missed appointments still trigger incarceration recommendations regardless of cause.

137. Placement stability conditions likewise trigger incarceration recommendations when a foster placement fails, regardless of the reason.

***Excessive Detention and Recidivism Rates***

138. Probation's risk assessment tool relies heavily on arrest data; given the County's high arrest rate, youths accumulated more arrests, including for low-risk, disability-related conduct, leading to incarcerated even for low-risk original offenses.

139. Many youth are repeatedly released, placed on probation, and re-detained for violations; DRC's inspections repeatedly found the same youth with disabilities back in custody.

140. The County does not track recidivism, though data exists: in 2023 it processed 264 delinquency petitions, 107 "subsequent," a 40 percent recidivism rate, corroborated by J.C. Montgomery's 2022–23 enrollment data showing 41 percent of students had multiple stays.

141. This recidivism reflects the County's failure to develop effective diversion or community supervision. Community probation staff routinely revoke probation and re-detain youth facing school or family difficulties rather than providing support, disproportionately confining youth with disabilities for behavior that could be addressed more effectively, and at less cost, in the community.

**REMEDIAL MEASURES ARE ACHIEVABLE**

142. With reasonable modifications to its program, Defendants could correct these violations, including by:

a. Reducing excessive force through re-training probation staff as counselors rather than guards;

b. Eliminating pepper spray;

c. Reforming the discipline and incentive system;

d. Providing robust programming to reduce idleness, build skills, reduce recidivism, and mitigate disciplinary incidents;

e. Improving facility climate through better nutrition, warmer clothing and bedding, and youth input on their needs and concerns;

f. Convening weekly meetings between Probation, its mental health contractor, and school staff to address youths' individualized disability needs and reduce disproportionate discipline;

g. Funding independently run, community-based diversion programs and defense-based advocacy to reduce excessive arrests and detentions;

h. Expanding re-entry services and coordinating with KCOE on school-related disability needs to reduce recidivism;

i. Reforming probation supervision to focus on rehabilitation, rather than technical compliance;

j. Discouraging status-offense arrests and declining to detain youth for non-violent conduct, including probation violations; and

k. Eliminating Probation's involvement in school discipline.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*Fourteenth Amendment (42 U.S.C. § 1983)*

143. Plaintiff incorporates by reference the preceding paragraphs.

144. This claim is brought against Defendant County of Kings and its Probation Department. DRC Constituents confined at the Juvenile Center, whether detained or committed, have not been convicted of crimes and may not be punished. Their rights are governed by the Due Process Clause of the Fourteenth Amendment, which affords them

greater protection than the Eighth Amendment.

145. The Probation Department's acts and omissions described above, including their use of chemical agents, physical force, and restraints; punitive isolation and room confinement; and failure to protect youth from violence, constitute a pattern or practice that violates DRC Constituents' substantive due process rights, including their rights to reasonably safe conditions of confinement, freedom from unreasonable bodily restraint, and such training and supervision as is necessary to ensure their safety and provide a reasonable opportunity for rehabilitation. These violations result from the Probation Department's official policies and longstanding customs, which its policymakers have known of and failed to correct. *See* (¶¶ 57, 75, 77, 85, 91–92).

146. This conduct is objectively unreasonable. It is not rationally related to a legitimate nonpunitive governmental purpose or is excessive in relation to that purpose. Unless restrained, Defendants will continue this conduct causing irreparable harm to these youth.

147. Pursuant to 42 U.S.C. §1983, Plaintiff is entitled to declaratory and injunctive relief, attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

*Title II of the Americans with Disabilities Act (42 U.S.C. § 12131 et seq.)*

148. Plaintiff incorporates by reference the preceding paragraphs.

149. Title II of the ADA provides in relevant part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

150. DRC Constituents are qualified individuals with disabilities within the meaning of Title II of the ADA. All have disabilities that substantially limit a major life activity, and they all are, and/or will be residents of the Juvenile Center or otherwise in Defendants' custody and supervision, qualified to receive Defendants' services. 42 U.S.C. § 12131(2).

151. Defendants, including the Juvenile Services division of the Kings County Probation Department, are public entities subject to Title II. 42 U.S.C. § 12131(1).

152. Defendants have violated and continue to violate Title II of the ADA and discriminate against DRC Constituents by denying them the benefits of public services, programs, and activities based on their disabilities through their policies and practices regarding chemical and physical force, restraint, isolation, confinement, behavior management, mental health programming, reentry services, and education, as detailed above. Defendants deny Constituents equal opportunity to participate in and benefit from Defendants' programs; provide them less effective aids, benefits, and services than those provided to others; and otherwise limit their enjoyment of rights and opportunities available to others. 28 C.F.R. § 35.130(b)(1)(i)–(iii), (vii).

***Equal Access to Educational Opportunities***

153. Defendants remove Constituents from school, use pepper spray and physical restraints against them, fail to respond appropriately to their classroom behavior, and fail to provide reasonable accommodations, denying them instruction to make up for these removals and further escalating disability-related behavior, as detailed above (¶¶ 109-111; 119-130). This denies Constituents meaningful equal access to education relative to their non-disabled peers, 28 C.F.R. § 35.130(b)(1)(i)–(iii), (vii), and Defendants fail to make the reasonable modifications necessary to avoid this discrimination, 28 C.F.R. § 35.130(b)(7)(i).

***Conditions of Confinement***

154. Defendants disproportionately subject Constituents to force, restraint, isolation, confinement, and disciplinary sanctions, and withhold privileges, based on disability-related behavior without accounting for disability, as detailed above (¶¶ 69-111), compounding the denial of access to educational and rehabilitative programming and, given Constituents' unique need for adequate mental health and reentry services, further blocking equal access. Defendants fail to identify or track Constituents needing accommodations, fail to inquire whether behavior triggering these measures is disability-

related, and fail to modify related policies—the reasonable modifications necessary to avoid discrimination. 28 C.F.R. § 35.130(b)(7)(i). Defendants' behavioral eligibility criteria for socialization and in-person schooling likewise screen out Constituents from full participation, 28 C.F.R. § 35.130(b)(8), and Defendants' methods of administration have the effect of discriminating against Constituents and impairing the objectives of their educational and rehabilitative programs with respect to them, 28 C.F.R. § 35.130(b)(3)(ii).

***Supervision of DRC Constituents on Formal Probation.***

155. Defendants use criteria or methods of administering community supervision that result in discrimination against, and unnecessary institutionalization of, Constituents, including incarceration for technical violations that are not offenses, pose no public-safety risk, and stem from disability-related behavior, as detailed above (¶¶ 134-137). 28 C.F.R. § 35.130(b)(3). This causes excessive recidivism, psychological and physical harm, isolation from the community, and loss of liberty. Defendants fail to make the reasonable modifications to probation conditions necessary to avoid this, 28 C.F.R. § 35.130(b)(7), and fail to administer probation in the "most integrated setting" appropriate to Constituents' needs, 28 C.F.R. § 35.130(d).

***Juvenile Intervention Services – Diversion and Reentry***

156. Defendants administer juvenile intervention services in a manner that discriminates against and needlessly institutionalizes Constituents by failing to offer diversion and reentry programs accommodating their disabilities and instead incarcerating them for disability-related, non-dangerous behavior, as detailed above (¶¶ 130-141). 28 C.F.R. § 35.130(b)(3). Providing appropriate rehabilitative and community-based services would not fundamentally alter Defendants' programs.

157. Plaintiff and DRC Constituents have suffered and will suffer injury as a proximate result of these violations and are entitled to declaratory relief, injunctive relief, attorneys' fees, and costs.

## THIRD CLAIM FOR RELIEF

*Section 504 of the Rehabilitation Act, 29 U.S.C. § 794*

158. Plaintiff incorporates by reference the preceding paragraphs, including the factual allegations and legal theories set forth in the Second Claim for Relief.

159. Section 504 bars excluding an "otherwise qualified individual with a disability" from a program receiving federal financial assistance "solely by reason of" disability. 29 U.S.C. § 794(a).

160. DRC Constituents are otherwise qualified individuals with disabilities within the meaning of Section 504: each has a disability substantially limiting a major life activity and is, or will be, a resident of the Center or otherwise in Defendants' custody and supervision, qualified to receive Defendants' services.

161. The County, its Probation Department, and KCOE are recipients of federal financial assistance and operate "programs or activities" within the meaning of Section 504, including their educational and rehabilitative operations and Probation Department supervision. 29 U.S.C. § 794(b).

162. Defendants have violated and continue to violate the rights of DRC Constituents secured by Section 504 and its implementing regulations through their policies, practices, and procedures with respect to identifying students with disabilities, providing appropriate and legally required educational services, chemical and physical force, restraint, isolation, confinement, and behavior management; their policies, practices, and procedures with respect to mental health programming and reentry services; and their supervisory policies.

163. Defendants deny DRC Constituents the opportunity to participate in and benefit from Defendants' programs and activities; deny them the equal opportunity to achieve the same benefits others achieve in Defendants' programs and activities; deny them the equal opportunity to participate in Defendants' programs and activities; and otherwise subject DRC Constituents to discrimination. 28 C.F.R. § 42.503(a), (b).

### *Meaningful Access to Education*

164. Defendants remove DRC Constituents from school, fail to respond appropriately to classroom behavior, fail to identify and evaluate students with disabilities, and fail to provide a free appropriate public education to those who qualify.

165. Defendants remove Constituents from school, use pepper spray and physical restraints against them, fail to respond appropriately to their classroom behavior, and fail to provide reasonable accommodations, denying them instruction to make up for these removals and further escalating disability-related behavior, as detailed above (¶¶119-111; 119-129). This denies Constituents the opportunity to participate in or benefit from the aid, benefit or service, 34 C.F.R. § 34.104.4.

166. Defendants do not properly seek out, evaluate, and identify DRC Constituents with disabilities at J.C. Montgomery School. 34 C.F.R. §§ 104.32(a)-(b); 104.35(a). DRC Constituents did not receive evaluations in areas of suspected disability, nor is there an identifiable screening or records review process for identifying students with disabilities.

167. Defendants operate a chaotic J.C. Montgomery School classroom, with roughly seven to eight staff managing eight to ten youth working on different learning objectives at once. This distracting environment denies each qualified student a free appropriate public education, 34 C.F.R. § 104.33(a), and fails to provide special education and related aids and services that meet disabled students' individual needs as adequately as the needs of non-disabled students are met, 34 C.F.R. § 104.33(b)(1).

168. Defendants therefore deny DRC Constituents meaningful access to education at J.C. Montgomery School.

### *Conditions of Confinement*

169. Defendants disproportionately subject DRC Constituents to school removals, chemical and physical force, restraint, isolation, confinement, and disciplinary sanctions because of disability-related behavior, without accounting for disability, and withhold privileges on the same basis, conduct to which DRC Constituents are especially

vulnerable given their heightened need for mental health programming, reentry services, and special education to access Defendants' educational and rehabilitative programs. Defendants fail to identify or track Constituents who require accommodations, fail to inquire whether the behavior triggering these measures is disability-related, and fail to modify their policies and practices accordingly, the reasonable modifications necessary to avoid discrimination under 28 C.F.R. § 42.511. By using these practices and failing to account for disability in classroom and behavior management, Defendants employ criteria and methods of administration that discriminate against DRC Constituents, in purpose or effect, and defeat or substantially impair the objectives of Defendants' educational and rehabilitative programs with respect to them. 28 C.F.R. § 42.503(b)(3).

***Supervision of DRC Constituents on Formal Probation.***

170. Defendants employ criteria and methods of administering their community supervision program that discriminate against and unnecessarily institutionalize DRC Constituents, including by incarcerating these youth for technical probation violations that do not constitute an offense, pose no risk to public safety, and stem from disability-related behavior. This defeats or substantially impairs the objectives of the County's formal probation program with respect to DRC Constituents and causes excessive recidivism, psychological and physical harm, isolation from the community, and needless loss of liberty. 28 C.F.R. § 42.503(b)(3). Defendants have failed to make the reasonable modifications to probation conditions necessary to avoid this unnecessary incarceration and discrimination, *Alexander v. Choate*, 469 U.S. 287 (1985), and have failed to administer their probation services in the "most integrated setting" appropriate to DRC Constituents' needs. 28 C.F.R. § 42.503(d).

***Juvenile Intervention Services – Diversion and Reentry***

171. Defendants violate Section 504 by administering their juvenile intervention services in a manner that subjects DRC Constituents to discrimination and needless institutionalization, including by failing to offer diversion and reentry programs that support and accommodate their disabilities and instead incarcerating youth for disability-

related behavior that poses no risk to public safety. Defendants' criteria and methods of administering these services defeat or substantially impair the objectives of the County's juvenile intervention program with respect to DRC Constituents, resulting in high rates of arrest, recidivism, and placement on formal probation. 28 C.F.R. § 42.503(b)(3).

172. Providing DRC Constituents with appropriate rehabilitative services while on probation, along with evidence- and community-based services to avoid unnecessary incarceration and formal probation, would not fundamentally alter Defendants' programs, services, or activities. Among other irreparable harms, these youth experience high rates of recidivism, psychological and physical harm, isolation from the community, and needless loss of liberty, and Plaintiff and DRC Constituents have suffered and will suffer injury as a proximate result of Defendants' violations of their rights under Section 504.

173. Pursuant to 29 U.S.C. § 794a, Plaintiff is entitled to declaratory relief, injunctive relief, attorneys' fees, and costs.

## FOURTH CLAIM FOR RELIEF

*Govt. Code § 11135*

174. Plaintiff incorporates by reference the preceding paragraphs, including the factual allegations and legal theories set forth in the Second and Third Claims for Relief.

175. Section 11135 provides that no person shall, on the basis of disability, "be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under," any state-funded or state-administered program. Cal. Gov't Code § 11135(a). DRC Constituents are persons with disabilities who are or will be in Defendants' custody or supervision and qualified to participate in Defendants' programs. Cal. Gov't Code § 12926.

176. Defendants operate or administer programs receiving state financial assistance within the meaning of section 11135, including the educational and rehabilitative programs described above.

177. For the same reasons and the same conduct alleged in the Second and Third Claims for Relief, Defendants' policies and practices regarding school removals,

chemical and physical force, restraint, isolation, confinement, behavior management, mental health programming, reentry, and probation supervision deny DRC Constituents full and equal access to Defendants' programs and activities, in violation of section 11135 and its implementing regulations. Cal. Code Regs., tit. 2, §§ 11140 et seq., 11154(a)–(c), (g). Because section 11135 independently incorporates the ADA's Title II protections, Defendants' violation of Title II as alleged in the Second Claim for Relief is also a violation of section 11135. Cal. Gov't Code § 11135(b).

178. Because Defendants' conduct is ongoing and causing irreparable harm, including lost educational opportunities, declaratory and injunctive relief are appropriate, together with reasonable attorneys' fees and costs. Cal. Code Civ. Proc. §§ 526(a), 1021.5.

**FIFTH CLAIM FOR RELIEF**

*Article IX, Sections 1 and 5 of the California Constitution*

179. Plaintiff incorporates by reference the preceding paragraphs.

180. Defendants, who are charged with educating DRC Constituents while detained at the Juvenile Center, have violated their rights under Article IX, sections 1 and 5 of the California Constitution to learn in a "system of common schools" providing the "diffusion of knowledge and intelligence . . . essential to the preservation of [their] rights and liberties."

181. These provisions require Defendants to provide an education meeting "prevailing statewide standards," *Butt*, 4 Cal.4th at 685–87, including adequate daily grade-level instructional time. By failing to provide this instruction and permitting school removals that deprive Constituents of access to school, Defendants deny them their fundamental right to an education.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff DRC prays that this Court enter an Order:

1. Declaring that Defendants' conduct alleged herein has violated, and continues to violate, the Fourteenth Amendment; Title II of the ADA, 42 U.S.C. § 12131

*et seq*., and its implementing regulations; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations; and California Government Code section 11135 and its implementing regulations;

2. Preliminarily and permanently enjoining Defendants from violating the Fourteenth Amendment; Title II of the ADA and its implementing regulations; Section 504 and its implementing regulations; Article IX, sections 1 and 5 of the California Constitution; and California Government Code section 11135 and its implementing regulations;

3. Requiring Defendant County of Kings and its Probation Department to provide reasonable accommodations and modifications to their policies, practices, and procedures governing (a) school removals and chemical and physical force; (b) restraints, isolation, and solitary confinement; (c) behavior management, mental health services, and discipline; and (d) probation supervision, reentry, and diversion, so that youth with disabilities are not subjected to discrimination or unnecessary institutionalization, including by eliminating chemical force and forms of restraint and isolation that disproportionately impact youth with disabilities;

4. Requiring Defendant Kings County Office of Education to provide the reasonable accommodations and modifications described above by: (a) implementing a system to track use of force, isolation, discipline, accommodations, education access, due process rights, grievances, reentry issues, and case management for youth in and out of enrollment at J.C. Montgomery School; (b) implementing data systems to track identification of students with disabilities, education access, school discipline, use of restraints and seclusion, due process rights, alternatives to detention, and educational outcomes; and (c) appointing an independent expert to monitor Defendants' implementation of these systems and processes;

5. Retaining jurisdiction over this case until Defendants have complied with the Court's orders and there is reasonable assurance of continued compliance absent continuing jurisdiction;

6. Waiving the security requirement of Rule 65(c);

7. Awarding Plaintiff's reasonable attorneys' fees and costs as authorized by law; and

8. Granting DRC such additional relief as the interests of justice may require.

DATED: September 29, 2026

DISABILITY RIGHTS ADVOCATES

By: *<u>/s/ Shawna Parks (As authorized on 9/29/26)</u>*
Shawna Parks
Amelia Evard

DISABILITY RIGHTS CALIFORNIA

By: *<u>/s/Megan Stanton-Trehan (As authorized on 9/29/26)</u>*
Megan Stanton-Trehan
Charlotte Lanvers